PINKERTON *v.* MANCHESTER AND LAWRENCE RAILROAD.

Upon a pledge of stock in a railroad corporation in this state, there should be such delivery as the nature of the thing is capable of; and, to be good against a subsequent attaching creditor, the pledgee must be clothed with all the usual muniments and indicia of ownership.

Under the laws of New-Hampshire, a record of the ownership of shares must be kept by such corporations in this state, and by proper certifying officers resident therein.

On the transfer of stock, the delivery will not be complete until an entry of such transfer is made upon the stock record, or it be sent to the office for that purpose; and the omission thus to perfect the delivery will be *primâ facie* and, if unexplained, conclusive evidence of a secret trust, and, therefore, as matter of law, fraudulent and void as to creditors.

Where the transfer was made at a distance from the office, and the old cer-tificates surrendered and new ones given by a transfer agent appointed for that purpose and residing in a neighboring state, proof that the proper evidence of such transfer was sent to the keeper of the stock record, to be entered, by the earliest mail communication, although not received until an attachment had intervened, would be a sufficient ex-planation of the want of delivery, and such transfer would be good against the creditor.

But where the pledge was made in Boston, on the eighth day of July, by a delivery over of the certificates, and nothing more done until the third day of the following August, and then the old certificates were surrendered to the transfer agent there, and new ones received from him, and notice given by the first mail to the office at Manchester, in this state, it was *held*, as against an attachment made between the obtaining the new certificates and the notice to the office, that the possession was not sea-sonably taken, and the transfer, therefore, was not valid.

Where, upon a sale on execution of shares in a corporation, a certificate is demanded of the corporation by the purchaser, and a suit is brought for refusing to give such certificate, the measure of damages is the value of the stock at the time of the demand, with interest, and not the value at the time of trial, or at any intermediate period.

ASSUMPSIT, for refusing, on demand, to give the plain-tiff, George W. Pinkerton, a certificate of twenty-nine shares of the stock of said road, and to pay him the dividends on the same stock.

On the trial, it appeared that on or before July 8, 1854, one Henry M. Holbrook owned ninety-six shares in the stock of the road, and on that day assigned the ninety-six shares, with other assets, to the Granite Bank, Boston, of which he was the president, as collateral security for his debts to the bank, amounting to over one hundred thousand dollars. The certificates of said stock, held by said Holbrook, being three in number, were transferred, by an indorsement on the back of each, signed by said Holbrook, and dated July 8, 1854, and were to A. Foster, cashier, as collateral. The certificates were delivered to the bank on the eighth or tenth of the same July, and they remained in the bank, without any entry of a transfer on the books of said road, until the third of August of the same year. On that day, from five to fifteen minutes past two o'clock in the afternoon, Holbrook delivered the certificates at the bank to Moses J. Mandell, to have the transfer aforesaid entered on a book kept by Mandell, as transfer agent, at the office of Brown & Sons, brokers, in Boston, of which firm Mandell was a member; and at that time such entry was made, showing that the shares were transferred, the old certificates surrendered by the bank to said Mandell, and new ones issued by him to the bank for the same stock, he being furnished with blank certificates, signed by the president and treasurer, for such purposes. The old certificates, with a notice of transfer, were sent by Mandell, by the earliest conveyance, to the office of said railroad at Manchester, and were received there at about 8 o'clock that afternoon; and afterward, in September, 1857, a corresponding entry of the transfer made in the proper books at that office, as of the date September, 1857.

It appeared by the records of the corporation that at a meeting duly held on the 30th day of June, 1852, it was voted that Enoch N. Abbott, of Manchester, be chosen treasurer of the corporation, with authority to

appoint a transfer agent in Boston; and it appeared that Mandell, on said 3d day of August, and for some time before, was acting as such transfer agent, and was furnished by the corporation with books to be used for that purpose, and with blank certificates of stock, signed by the proper officers of the corporation, and to be filled up and used by him in the course of his business as such agent.

It appeared by the deposition of Pinkerton, that Mandell officiated in the capacity of transfer agent, and that he was acting as such on said 3d day of August, and that he performed the duty usually devolving on transfer agents; and it appeared also that what the said Mandell did in relation to the issuing of new certificates, and sending notice to the office at Manchester, and making a record of such transfer on the books so kept by him, was in the regular course of his business as such transfer agent; and that Pinkerton was then aware that Mandell was accustomed to fill out and issue such new certificates of stock, on the old ones being surrendered up to him, and to send the old ones immediately by express to the treasurer's office, at Manchester.

Previous to the 3d of August, 1854, the plaintiff was the holder of a note, on which Holbrook was liable; and being in Boston on that day, and understanding that Holbrook had failed, a little before 12 o'clock at noon went to Mandell's office, to ascertain whether Holbrook had made any sale or assignment of the stock which he knew Holbrook had owned in the Manchester and Lawrence Railroad, and found that no transfer had been entered there. He then went by the next train to Manchester, procured a writ to be made on his note against Holbrook in the name of George W. Taylor, and eight minutes after 5 o'clock in the afternoon, before any transfer had been made of the stock on the books at Manchester, and before any notice had been received there of the transfer,

Pinkerton *v.* Railroad.

caused the ninety-six shares standing in the name of Holbrook on the books of the road, at Manchester, to be attached as his property.

There was no evidence that, at the time when this attachment was made, either Pinkerton or Taylor, or the officer who made the attachment, had any knowledge or notice that the stock had been sold or assigned by Holbrook.

On the third Tuesday of April, 1856, the plaintiff, in Taylor *v.* Holbrook, recovered judgment for the amount due on the note sued, being $1,661.50, and costs, taxed at $16.63. The execution issued on the judgment was duly levied, within thirty days, on the stock attached on mesne process, and on the 12th day of July, 1856, twenty-nine of the shares attached were duly sold on the execution to the plaintiff, and due return made thereof.

On December 11, 1856, before this suit was brought, the plaintiff duly demanded of the road certificates of the twenty-nine shares to be issued to him, and also the dividends on the same shares, which the road refused; and he also demanded of the road the aforesaid dividends in August, 1858.

It further appeared that on the 9th day of July, 1856, the said Granite Bank commenced a suit against said railroad, in the superior court for the county of Suffolk, Massachusetts, for the dividends that had been declared on said ninety-six shares, and on the 28th day of April, 1857, recovered judgment for the sum of $301.68 damages, and $54.21 costs. No defense was made to this suit by the railroad, but judgment was rendered on default after an appearance.

A verdict was taken, by consent, for the plaintiff, for $5,000, subject to the opinion of the court; to be set aside, reduced, or judgment rendered thereon, as the court should order.

*W. C. & S. G. Clarke*, for the defendants.

1. To pass the property in shares of the capital stock of the Manchester & Lawrence Railroad it is not necessary between the parties, or an attaching creditor of the vendor, that there should be any entry, or record of the transfer, made on the books of the corporation. In other words, the assignment, accompanied by a delivery of the certificates held by Holbrook, made on the 8th day of July, 1854, from Holbrook to the Granite Bank, transferred to and vested in the bank all Holbrook's interest in the stock, without any thing further being done.

In support of this proposition we submit the following considerations : (1) That there are no provisions, either in the charter or by-laws of the defendant corporation, regulating or in any way restricting the sale of its stock ; (2) That any by-law requiring a particular mode of transfer, or the assent of the corporation, or any of its officers, would be void. Laws of 1849, ch. 860, sec. 2 ; Comp. Stat., ch. 147, sec. 21 ; *Sargent* v. *Franklin Ins. Co.*, 8 Pick. 90. It follows that any such usage or custom of the company to have transfers made in any particular way would not be binding. (3) In the absence of by-laws or statute regulations, on general principles it is not necessary that the corporation or its officers should assent to the transfer. See, also, *People* v. *Devin*, 17 Ill. 84 ; *Stebbins* v. *Phenix Ins. Co.*, 3 Paige 350. Thus it is not necessary that the owner of shares should have a certificate signed by the officers of the company. *Ellis* v. *Essex Bridge*, 2 Pick. 248 ; *Chesley* v. *Pierce*, 32 N. H. 402. So also a transfer made in violation of the valid rules and by-laws of the company, is valid to pass the property as between the parties and against creditors. *Quiner* v. *Marblehead Ins. Co.*, 10 Mass. 476 ; *Bank of Utica* v. *Smalley*, 2 Cow. 770 ; 11 Wend. 629 ; *Gilbert* v. *Manchester Iron Co.*, 9 Wend. 628 ; *Eames* v. *Wheeler*, 19 Pick. 442 ; *Bank* v. *Kortright*, 22 Wend. 348 ; *St. Louis Ins. Co.* v.

Pinkerton v. Railroad.

*Goodfellow*, 9 Mis. 149; *Sargent* v. *Essex Marine Railway*, 9 Pick. 204; *Plymouth Bank* v. *Bank of Norfolk*, 10 Pick. 454, 459; *Alvord* v. *Smith*, 5 Pick. 232. (4) In the absence of authorities, the foregoing proposition would seem to follow as the necessary conclusion from holding that shares in a joint stock company are personal property. *Bradley* v. *Holdsworth*, 3 M. &. W. 422; *Tippets* v. *Walker*, 4 Mass. 595; *Denton* v. *Livingston*, 9 Johns. 96; *Hutchins* v. *State Bank*, 12 Met. 421, 426; *Humble* v. *Michell*, 11 Ad. & El. 205; *Arnold* v. *Ruggles*, 1 R. I. 165; *Johns* v. *Johns*, 1 Ohio 350; *Sargent* v. *Franklin Ins. Co.*, 8 Pick. 90; *Howe* v. *Starkweather*, 17 Mass. 243. There is some conflict in these and other cases whether such shares are to be regarded as chattels or choses in action. *Richardson*, C. J., in *Harris* v. *Stevens*, 7 N. H. 454, 456, says: " Shares in corporations are not, strictly speaking, chattels, but are rather in the nature of choses in action. They may, however, be the subject of a contract to sell." But whether held to be chattels or choses in action, the conclusion seems equally clear that a contract for the sale of stock becomes executed by a delivery to the purchaser of the certificates of the shares, or any other *indicia* of the property. This is especially true when the delivery of the certificate is accompanied by a deed or bill of sale of the vendor's interest in the stock. If they are choses in action no good reason appears why they may not be assigned, like other choses in action. *Jones* v. *Witter*, 13 Mass. 304; *Wilson* v. *Little*, 2 Comst. 443; *Prescott* v. *Hull*, 17 Johns. 284; *Cameron* v. *Little*, 13 N. H. 23; *Thompson* v. *Emery*, 27 N. H. 269, and numerous cases cited.

2. But if the assent of the corporation, or an entry of the transfer on its books, was necessary, that assent was given and that entry made prior to the attachment of the stock as the property of Holbrook. The corporation were bound by the acts of Mandell, the transfer agent,

acting within the scope of his authority. *Bank of Buffalo* v. *Kortright*, 22 Wend. 348. He was the acknowledged agent of the company to receive notice of the transfer of shares, and to issue new certificates. It appears, also, that there was a regular established course of business in this respect; and we also find that the courts regard usages relative to the transfer of stock. *Chambersburg Iron Co.* v. *Smith*, 11 Penn. 120; *Kortright* v. *Buffalo Bank*, 20 Wend. 91; S. C., 22 Wend. 348; *Bargate* v. *Shortridge*, 31 E. L. & E. 44. It appears, also, that the plaintiff was well aware of this custom. He applied to Mandell for information, and, we submit, recognized him as the transfer agent of the company. We submit, also, that the books kept by Mandell were proper books of the company to enter the transfer of shares upon, and to show whether the stock of a known holder had been transferred or not; at least that, under the circumstances of this case, the plaintiff is not at liberty to say they were not. These books were not the private property of Mandell, and were not kept for his convenience; but they were furnished by the corporation, and were their property. In *Downing* v. *Potts*, 3 Zabr. 66, it was held that the transfer books, in case of a dispute, must control the stock ledger. See, also, *Haynes* v. *Brown*, 36 N. H. 545.

3. It may be queried whether, if the plaintiff is the owner of the stock in question, he can recover any thing more than the dividends and nominal damages for the refusal to deliver or give to him a certificate. On the other hand, if the corporation have converted the shares to their own use, then, we submit, that the measure of damages is the value of the stock at the time of the demand and refusal, and interest from that time. *Hussey* v. *Bank*, 10 Pick, 415; 2 Kent's Com. 480, *n*. 6. The same rule should be applied as in trover, and the breach of contracts of sale.

*Perley* (with whom were *Clark & Smith*), for the plaintiff.

1. The statutes of this state require that every railroad corporation should have a book, or set of books, kept at one place, by one and the same officer, containing "the records or accounts of the shares or interests of the corporators therein." Comp. Stat., 500, sec. 20; 355, sec. 67; 315, sec. 8; 119, sec. 7.

These enactments show too clearly for doubt that every corporation in the State is required to keep, in one book or set of books, by one officer, at one place which must be the principal place of business, a record or account of all the stockholders, and the number of their shares; for unless the certifying officer had charge of books containing an account of all the stockholders and their shares, he could not give the certificates required for various purposes by the different provisions of the statutes. And the general object of these laws manifestly requires that there should be one office and one set of accounts, to which parties interested may resort to ascertain who are the owners of the stock. It would, therefore, be wholly immaterial to this case, even if it should be held that the principal place of business, and the books containing the account of stockholders, might be kept out of this state; inasmuch as the corporation can have but one principal place of business, one set of such books, and one certifying officer; for if the corporation had the power to remove, with their principal office and their accounts, into another jurisdiction, they have not attempted to exercise the power, but have in fact maintained their principal place of business, and kept the books containing the required account of stockholders at Manchester. The treasurer had the care of these books at Manchester, and was the proper officer to certify under the statutes, and would, doubtless, have been liable to the legal penalty if he had refused. Creditors and others had the right to look to these books, kept at the principal place of business in this

state, as the sole authentic record of the stockholders and the stock, required by law to be kept for their information. There is no pretense that any books, kept by Mandell in Boston, contained, or were intended to contain, a full account of all the stockholders, or that he could have given the certificates required by law.

2. But the law requires this road, which is wholly within this state, to maintain its principal place of business and keep the books containing the account of the stockholders in this state.

All the statutory provisions on this subject must be construed together. The general design of them all, undoubtedly, is to give a practical locality to this kind of property, by requiring a record of the stockholders and stock to be kept at one place, by the same officer, who is bound to furnish certificates from his books, and thus place corporations under the control of the public authorities, and give effect to the laws which make stocks liable for debt. If the ground taken by the defendants should be maintained, and the books and principal place of business might be removed into a foreign jurisdiction, the corporation and the stockholders would be placed beyond the control of our laws; all the provisions of the statutes which require certificates of stockholders for various purposes, would be successfully evaded; no attachment of stock could be made, here or elsewhere. Take the case of this road. If merely providing for the payment of dividends here would answer the law, and supersede all the provisions of the statute on this subject, a creditor could obtain here no information as to the stock of his debtor, nor could any attachment of the stock be made here or elsewhere; not in this state, because it would not be necessary to have here any office or officer on whom service could be made; nor abroad, for the road, being wholly in this state, the stock would not be subject to the foreign process. With the single exception, if there

Pinkerton v. Railroad.

can be any exception, of a case where the road exists in this and another state, under the laws of the two states, and the stock can be taken for debt in the foreign state, we confidently submit that the books, and the officer who certifies from them, must be in this state.

The clause of the statute (Comp. Stat., ch. 15, sec. 67) which is relied on to relieve railroads and their stockholders from all these obligations and liabilities, must, in construction, we submit, be referred and limited to the next preceding sentence—"all books, papers, and funds of the corporation," &c.; and taking the whole section together, and looking to the different provisions of the statutes *in pari materia*, that clause can mean no more than that if provision is made for paying dividends here, such books, papers and funds as are not necessary to comply with other provisions of the law may be kept out of the state. According to the concluding clause of the section, "the place of business of the corporation" must still be kept up and maintained in this state. But certainly it would not be the place of business of the corporation, within the meaning of the statutes on the subject, if no officer were there with books that would enable him to comply with the numerous provisions of the law, which require certificates of the stockholders to be furnished to public officers and private individuals. It would be remarkable if a straggling clause like this should be found to defeat all the provisions of the laws enacted to place corporations, and their stockholders and stock, under the control of our laws, make the stock liable for taxes and for debt, as would be the case if the books containing the account of stockholders, and all officers and books might be removed beyond our limits, provided a simple provision was made for paying dividends to our stockholders in the state. We maintain that the statutes of the state can not be complied with, nor the object of the laws reached, unless the road keep

their stock record and their certifying officer in this state, within the control of our laws.

3. Under the statutes of this state, the *bonâ fide* creditor of a stockholder will hold by attachment against another creditor, who claims under a prior assignment by way of pledge, provided the attachment is made before the transfer of the assignment is entered on the transfer books of the corporation, or notified to the officer having charge of those books.

In early times the members had no property in corporations, and the common law provides no method of taking such property for debt. *Denny* v. *Hamilton,* 17 Mass. 240; *Wildman* v. *Wildman,* 9 Ves. 97; *Denton* v. *Livingstone,* 9 Johns. 96.

The statute of December, 1812, is believed to be the first general law of this state that made stock in corporations liable for debt. But at the present time a very large proportion of all the property of debtors consists of such stock; and the provisions of the statutes are numerous and careful, which are intended to secure the creditor the right of applying such property to the payment of debts due from stockholders; and to prevent the fraudulent evasion of this right, the facility with which that kind of property is passed from hand to hand requires that the principles of the common law applicable in other analogous cases should be faithfully applied, where a question arises between a creditor and purchaser, or between two creditors, one claiming under an attachment and the other under a sale or pledge from the stockholder. The questions in this case arise under the provisions of our statutes, and cases decided in former times, or in other jurisdictions, where the law is not shown to be like ours, are not in point.

If the simple transfer of the certificate would convey the title to stock as against a creditor, leaving the debtor to stand as the ostensible owner on the books of the cor-

poration, to which the statutes refer the creditor when he comes to secure his debt on the stock, all the provisions of the statutes which are intended to guard and secure the right of a creditor to satisfy his debt out of the stock are wholly ineffectual and illusory. The creditor would have no more security on the corporate property of his debtor than on the same amount of bills issued by a bank. He could just as easily tell who was holder of the bills as of the stock.

The intention of the statutory provisions on this subject must have been to provide for the owner of stock a convenient and uniform method of notifying his title on the books of the corporation to creditors and others interested, so that they may not be deceived by a false appearance of property; and to furnish the creditor with the means of learning at once and with certainty who were, as to his claims, the legal owners of the stock. The statutes may not have provided, in express terms, that, as to creditors, transfers of stock shall not be valid till they are recorded in the transfer books; but that is necessarily implied, because to give them any other construction would be inconsistent with the whole design of those statutes, and entirely defeat the law which makes stock liable for debt; and it may well have been thought wiser and safer to leave the effect of these various provisions on the rights of creditors to be determined by the principles of the common law applicable to analogous cases, rather than to attempt in the statutes to define in detail the operation of the law in that respect.

The statutes evidently intend that corporations shall be required to keep a record of the stock and stockholders in books at the principal place of business, so that all parties interested may know who are the owners of the stock, and how it may be reached. To these books, and the officer who has them in charge, the creditor is sent by the law, when he desires to know whether his debtor owns

stock that may be taken for his debt. The property is not itself capable of manual delivery and open possession. The certificate is a private document that passes secretly from hand to hand; the creditor can never know who is the holder of it. But the title to this kind of property is made capable of a notoriety equivalent to delivery and possession, by recording the transfer on the books, according to the statutes; and the obvious intention is, that, as to the creditor, this record on the books, which are required to be kept for his information, shall take the place and answer the purpose of the delivery and possession required in the case of visible personal property.

Though there has been a sale or pledge of personal property valid between the parties, yet, till possession has been taken, the sale does not affect the right of a creditor. In some cases, where the nature and situation of the property are such that actual possession can not be taken, the delivery of documents which give the control of the property, and are the best notice that the circumstances admit, are allowed to supply the place of actual delivery and possession; but those cases have no application here, because the transfer of the certificate gives no control of the stock till it is entered on the transfer book. Till then the assignee of the certificate would not be allowed to vote as a stockholder nor take a dividend; and the law provides a ready and uniform method by which the assignee gives authentic notice of his title on the books of the corporation, which the law requires to be kept for that purpose. Why, in the case of goods, must the purchaser, before he can claim against a creditor, take actual possession? Clearly because otherwise his title would be secret; the seller would still appear to be the owner, and the creditor misled and deceived. So in the case of stock, and much more strongly. Unless the sale or other transfer is recorded where the law provides, the sale would be secret, and mislead the creditor, who reads the statutes

and looks to the record which they provide and hold out to him as the evidence of ownership on which he is to rely. Where the purchaser of a chattel can give notice of title by taking possession, he must, if he would hold against a creditor. So we say, for the same reason and on the same principle of the common law, the purchaser can give the statutory notice of his title, by entering the transfer on the books required to be kept for that purpose, and must, if he means to set up his claim against a creditor who attaches *bonâ fide* and without notice.

In construction, then, we submit that, adopting the familiar principles of the common law, in reference to which all statutes are passed, the laws of the state — which have completely changed the nature and character of the interest which corporators have in the corporate property; which make the stock liable for debt, like visible personal property, provide a mode of attachment by service on an officer of the corporation, require a record to be kept in one place by an officer, who is bound under a penalty to give a certificate, showing who the stockholders are, to the sheriff, when he comes to attach, and thus refer the creditor to that record, when he seeks to learn what stock he can take for his debt as the property of his debtor — make the stock standing on the books as the property of the debtor liable for his debts, notwithstanding a secret transfer of the certificate, of which the creditor has no information nor any means of obtaining it.

And if such is the effect and meaning of the statutes, it can make no difference in this case whether the intention is declared in express terms, or necessarily implied by fair construction from the provisions of the different statutes. If such is the scope and meaning of the laws, it stands as strong as if a general law, or the charter, or a valid by-law, had declared in express term that the transfer of a certificate should be inoperative or void, as to a creditor, till entered on the transfer book ; for no one, I suppose,

would think of contending that, though the word "void" were used, the transfer of the stock *bonâ fide* would be inoperative between the parties. Between them it would transfer an equitable interest. The authorities are, therefore, in point, which hold that where the charter or a by-law provides that a transfer shall be void or inoperative till entered on the book, an antecedent transfer of the certificate is invalid against an attaching creditor without notice. *Fisher* v. *The Essex Bank*, 5 Gray 373; *Union Bank* v. *Laird*, 2 Wheat. 390; *Sabin* v. *Bank*, 21 Vt. 363; *Turnpike* v. *Bunnel*, 6 Conn. 558; *Bank* v. *Railroad*, 8 Kern. 621, 622.

The reasoning of Chief Justice *Shaw*, in *Fisher* v. *The Essex Bank*, applies with full and controlling force to the present case, and shows that earlier cases, when the amount of this kind of property was comparatively trifling and the laws different making it liable for debt, are not in point at the present time.

There are some cases cited for the position that a mere transfer of the certificate will convey a good title against a creditor who attaches without notice. But, in the first place, so far as I have observed those cases, they do not show the form of the certificate, and give the means of knowing what title or interest the certificate purported to give the assignee, which might be extremely material; for the assignee's claim would be on his certificate, and must be made according to the terms of it. Then, again, until it were known what were the provisions of the local law making stock liable for debt, it would not appear whether the cases were authorities under our statutes. As the character of this sort of property has changed, and the laws which regulate the application of it for debt have been modified, the decisions have been progressive in a corresponding degree, and the late cases put it, in substance, on the same footing, in respect to the rights of creditors, as tangible personal property. The earlier

cases assumed that stock was like a chose in action, which, at common law, could not be taken for debt, and the decisions appear to have gone on that assumption. But at the present time, and under the laws of this state, stock in corporations, so far as the right of the creditor to take it for debt is concerned, has no resemblance whatever to a chose in action. It stands, except as to the manner in which the creditor proceeds to obtain his lien, exactly on the same footing with other attachable personal property. The identical specific property is taken, sold at auction, and the money applied on the execution; and though the property is not tangible and capable of manual delivery, yet the statute provides a uniform method of notifying a change of title, which is intended to supply the place of actual possession in other cases. No action can be maintained for it as for a chose in action, and it can not be attached in the trustee process for the debt of the stockholder, as a chose in action may. When stock could not be taken for debt, in that respect it resembled a chose in action, but that resemblance is lost under our statutes. The right of the creditor to take and apply stock to the payment of his debt is as perfect and complete; the method of taking and disposing of the property, so far as it can in any way affect the present question, is the same; the manner of giving notice of a change of title is as easy, and notice at least as necessary as in the case of tangible personal property; and all the reasons that require a purchaser or pledgee to take possession, or do some other equivalent act, apply with full and peculiar force to this kind of property; and require that the purchaser should complete his legal title, by entering it on the books of the corporation, which the law has provided to be kept for that purpose, if he would hold against a creditor, who has a right to rely on the information which the law gives him on application to those books.

The rule is extremely familiar that to complete the

sale or assignment of a chattel, so that the vendee or assignee can hold against an attaching creditor, without notice, a delivery is necessary. *Shumway* v. *Rutter*, 7 Pick. 56; *Trask* v. *Bowers*, 4 N. H. 314; *Parsons* v. *Dickinson*, 11 Pick. 354; *Carter* v. *Willard*, 19 Pick. 5. In those cases where the law allows a substitute for actual delivery, because the nature of the property is such that a delivery can not be made, the creditor is not deceived, for he has no reason to expect any other evidence of a transfer, and gives or withholds credit accordingly. But, in this case, a mere assignment of the certificate is no notice at all of the transfer, and the law provides an easy and effectual mode of notifying the change of title to all concerned; and on that notice, we submit, the creditor has the right to rely under our statutes, when he gives credit or seeks to secure his debt.

4. According to the terms and conditions declared in the certificates issued, the assignee of a certificate did not become a stockholder until the transfer was entered on the transfer books.

By article 4 of the by-laws, the directors are required to prescribe the form of certificates of stock, the manner of transferring shares, and the books and amount to be kept. The certificates issued to Holbrook, as in other cases, declared that he was the owner of a certain number of shares, subject to the charter and by-laws, "the same being transferable by an assignment thereof in the books of said corporation, or by a conveyance, in writing, recorded in said books; and when a transfer shall be made, or recorded in the books of the corporation, and this certificate surrendered, a new certificate or certificates will be issued."

We must presume that the certificates are in the form prescribed by the directors; otherwise they were not legally issued, and conferred no right. According to the certificates issued pursuant to the by-laws, it was neces-

sary that the transfer of the certificate should appear on the books, either by an original assignment on the books, or by a record of the transfer entered there. The assignee of the certificate did not become a stockholder, or the owner of any stock, until his title appeared on the transfer books. Until such a record of the assignment, all that the assignee had was the undertaking of the road contained in this certificate; that when he presented the certificate, and entered the assignment on the books, a new certificate would be issued to him, which would make him a stockholder, and give a legal title to the stock. The party named in the original certificate is admitted a stockholder; but the certificate is not a negotiable security, and the transfer of the certificate, however it may be in other corporations, does not of itself, even as against the road, make the assignee a stockholder; he must first comply with the terms of the certificate, which are in agreement with the provisions and policy of the public law, by having the transfer entered on the books, which the corporation are required to keep in order to comply with the various provisions of the statutes on this subject. Of course where the certificate speaks of an entry on the books of the corporation, it means the books kept by the treasurer according to the by-laws for that purpose; an entry on the cash-book, or time-book of the hands, would not answer. And when the regulations of the road have prescribed the manner in which stock shall be transferred, the stock can be transferred in no other manner; otherwise the regulations would be idle and inoperative; and if the regulations have prescribed as a rule that the stock shall be transferred by entry on the books, it would add nothing to their force to say that it should be transferred in that way only.

And the conditions inserted in the certificate issued under the by-laws are not only reasonable to protect the company against the confusion and embarrassment which

would necessarily follow in all their business, if a mere transfer of the certificate gave the rights of a stockholder, but also necessary to comply with the positive requisitions and the manifest policy of the public law, which intends to provide an authentic public record of the stockholders, on which creditors and all others who are interested may rely.

There are some cases in which a distinction is attempted to be maintained between a provision inserted in the charter and a like provision of the by-laws authorized by the charter; but it is difficult to assign any reason for it, and it has been wholly repudiated in later cases. *Turnpike* v. *Bunnel*, 6 Conn. 552; *Bank* v. *Railroad*, 3 Kern. 621. See, also, *Fisher* v. *Essex Bank*, 5 Gray 379.

5. The assignment to the bank was void as against creditors, because it was kept secret from July 8 to August 3, when Holbrook failed, without any attempt to give notice by entering it on the books. In the absence of all explanation it must be inferred, as matter of law, that the intention was to keep the assignment secret, unless and until Holbrook should fail. It has been held, in some cases of questionable authority, that the purchaser of a chattel, situated at a distance from the place where the sale is made, has a reasonable time allowed him to obtain possession, and that if he use due diligence he will hold, though a creditor attach before he is able to take a delivery. Such cases have no application here, as the assignment was kept back from July 8 to August 3, and no evidence is offered to explain this delay. This is, at least, equivalent to retaining possession where goods are sold; which, in the case of goods, would be *primâ facie* evidence of fraud against creditors. *Page* v. *Carpenter*, 10 N. H. 77–80; *Kendall* v. *Fitts*, 22 N. H. 1–7; *Lanfear* v. *Sumner*, 17 Mass. 110.

6. An entry on the books kept by Mandell, in Boston, is of no avail against a creditor. Neither the general

laws of the state, nòr the charter, nor even a by-law, recognize such books as a substitute for the book which every corporation must keep, containing an account and record of all the stockholders. Nor is there any thing in the action of the road, or the course of business in Mandell's agency, from which it can be inferred that his agency was intended or understood to dispense with the necessity of a transfer on the regular transfer book, kept at the principal place of business in this state, as the law requires. There is no vote or commission to define Mandell's duties or powers; nor any custom of such agencies proved in the case, to which the court can refer. The treasurer was to appoint him, and, so far as any thing appears, it must be understood that he was to act under the treasurer as his subordinate and assistant. The directors, by the charter, are to appoint all agents, and they could not delegate this power to the treasurer. It can not be supposed that the directors undertook to exceed their powers, by appointing an agency that should supersede the transfer office at the treasurer's, contrary to the by-laws, which require all transfers to be entered there.

The agency in Boston might be very convenient, as furnishing the means of forwarding prompt notice to the transfer office at Manchester, and having the transfer entered there; and such was the course of the business. The agent sent immediate notice to the road at Manchester, and the transfer was thereupon entered on the transfer book, which the by-laws required the treasurer to keep, containing an account of the stockholders, and all transfers. The books in Boston were not relied on as the record. The proper and only legal business of the agency was to forward notice to the regular and only legal transfer office at the principal place of business at Manchester.

To give any other or higher effect to this agency would wholly supersede and defeat all the statutory provisions on this subject. If this corporation might have

such an agency, every other corporation might; if in Boston, just as well in New-York, or San Francisco, or London. If the transfer on the books were effectual for one day, why not for a month or a year? There would be no officer who could give a certificate of the stockholders. No creditor could know whether his debtor owned any stock; and a railroad, wholly within this state, and deriving all its powers and its corporate existence from our laws, would be effectually removed beyond the reach of our public authorities and the control of our laws. The statutes making stock liable for debts would be completely evaded. In short, the whole system of the statutes, intended to place this kind of property within the reach of the law for various purposes, would be entirely defeated.

How could the treasurer at Manchester certify under oath to a sheriff, town-clerk, or assessor of taxes, that he had furnished a full list of all the stockholders, if there were an office or a dozen offices in this or other states, where transfers could be made binding on creditors and all others? Pinkerton's knowledge that there was such an agency in Boston could not defeat his legal right, unless, through the agency, he obtained, or might have obtained actual notice that would affect his conscience, and charge him with the equitable interest of the assignees. He inquired at Mandell's, and got no notice; and it can not be said that he is chargeable with any fraud that will prevent him from setting up his legal title. Beside, for every practical purpose, and therefore for every legal purpose, no notice was given, or intended to be given, on Mandell's books till the hours of business, when the broker's office would open on the next day, and until after the attachment was made. The certificates and the transfer were kept back, and not delivered to Mandell until after two o'clock on the third, when the broker's office, it was well known, would be closed, and not opened to the pub-

lic till the next day. The assignees must, as matter of law, be understood to have intended what they knew would be the effect of such a course; to wit, that their title should be secret, and concealed from all creditors till the next day. The bank held back their title till after Holbrook's failure, and until after the broker's office would, in the usual and uniform course of business, be closed, and well knew that no creditor would have any notice of their claim through the agency till the next day. We say, then, there was no public entry on the books of Mandell at the time when our attachment was made, and no entry that can be regarded in this case, because none that answered any purpose, so far as the creditor was concerned. The office of the treasurer in this state is open at all hours, for the purpose of making an attachment, like the town-clerk's, and in that respect differs from the office of a broker, which is closed, after a certain hour, to the public.

7. The measure of damages is "the highest market value of the stock between the breach and the time of trial." *Bank of Montgomery* v. *Reese*, 26 Penn. 143; *Wilson* v. *Matthews*, 24 Barb. 295; *Clark* v. *Pinney*, 7 Cow. 681; *Bush* v. *Canfield*, 2 Conn. 485; *Shepherd* v. *Johnson*, 2 East 211; *McArthur* v. *Lord Seaforth*, 2 Taunt. 257; *Harrison* v. *Harrison*, 1 C. & P. 412.

BELLOWS, J. This is an action of assumpsit, for refusing, on demand, to give to the plaintiff a certificate of twenty-nine shares of the stock of the Manchester and Lawrence Railroad, and to pay him the dividends on the same stock.

It appeared that on the eighth day of July, 1854, one Holbrook owned ninety-six shares of that stock, and then transferred them, by indorsement on the back of the certificate, to the Granite Bank, Boston, of which he was president, as collateral security for his debts to that bank,

amounting to over $100,000. The certificates were at the same time delivered to the bank, where they remained without any entry of a transfer on the books of the railroad, until the 3d day of the ensuing August, at a little past two o'clock in the afternoon, when they were delivered by Holbrook to Moses J. Mandell, who entered the transfer in a book kept by him as transfer agent, at the office of Brown & Sons, in Boston, of which firm said Mandell was a member, and the certificates were surrendered by the bank to Mandell, and new ones issued by him for the same stock, to the bank, he being furnished with blank certificates, signed by the president and treasurer, for such purposes; and by the earliest conveyance Mandell sent the old certificates, with notice of the transfer, to the office of the railroad, at Manchester, which was received there at about eight o'clock in the afternoon of the same 3d day of August; and afterward, in September, 1857, a corresponding entry of the transfer was made in the proper books at that office, as of the date of September, 1857.

It also appeared that the treasurer of the railroad corporation, by vote, in June, 1852, was authorized to appoint a transfer agent in Boston, and that on said 3d day of August, and for some time after, said Mandell was acting as such transfer agent, and was furnished by the corporation with books to be used for that purpose, and with blank certificates, signed by the proper officers of the corporation, and to be filled up and used by him in the course of his business as such agent; and it appeared, also, that what said Mandell did, in issuing new certificates, and sending notice to the office, at Manchester, and entering the transfer on the books kept by him, was in the regular course of his business as such transfer agent, and that the plaintiff was aware of this course of business, and that said Mandell acted as such agent.

It further appeared that on said 3d day of August

the plaintiff, a little before noon, went to Mandell's said place of business, to ascertain if Holbrook had transferred his stock, and finding that no transfer had been entered there, he went to Manchester, procured a writ upon a note he held against said Holbrook, and attached his stock in said corporation at eight minutes before 5 o'clock in the afternoon of said August 3, and without any knowledge, in him or the officer serving the writ, of any assignment of the stock.    Judgment was obtained in that suit, and twenty-nine shares of that stock sold to the plaintiff to satisfy it, on the 12th day of July, 1856; the lien acquired by the original attachment having been preserved.

The question now is, whether the assignment to the Granite Bank was good against the attaching creditor. To the regularity of the proceedings upon the attachment and sale upon execution, there is no exception; nor is there any objection to the existence of a *bonâ fide* debt to the Granite Bank; but the only question is, whether the transfer was so far completed as to be valid against an attaching creditor.   There is nothing, either in the charter or by-laws of the corporation, to prescribe or regulate the mode of making a transfer, but it is contended by the plaintiff's counsel that, until it is entered or recorded in the stock books of the corporation kept in this state, the transfer is not valid as against an attaching creditor.   And the argument is put upon two grounds:

1. That, by force of the various statutes upon the subject of the evidence of ownership of stock, and the keeping of the records, and the residence of the officers, and their duties, such entry or record is necessary to a valid transfer:

2. That, to constitute a complete delivery of the stock, such entry and record are necessary, as the natural and recognized *indicia* of ownership; and that, without such entry, the stock must be deemed to be still in possession of the assignor; which implies a secret trust, and is,

therefore, in the judgment of the law, fraudulent and void as to creditors.

In regard to the second ground taken by the plaintiff's counsel, namely, that without such entry or record the possession of the stock can not be deemed to have been changed, it is alleged, in answer by the counsel for the defendant, that the entry or record in the books of the transfer agency was sufficient, and the same as if entered in the books at Manchester; and it is also suggested that all the possession was given that the nature of the property was capable of, as in case of the sale of goods at sea; and it appears that, by the earliest conveyance after the old certificates were surrendered, the new one was sent to the office at Manchester, with notice of the transfer. Had this been done immediately upon the pledge, and the transfer recorded in the books at Manchester, a question might have arisen whether the possession was not perfected without unreasonable delay, and so as to prevail against an intervening attachment, as in *Ricker* v. *Cross*, 5 N. H. 570; and in the case of the sale of a ship in a distant port, as in *Putnam* v. *Dutch*, 8 Mass. 287; *Portland Bank* v. *Stacy*, 4 Mass. 661; or abroad, or at sea, as in the cases cited in *Ricker* v. *Cross;* and as in *Conard* v. *Atlantic Ins. Co?*, 1 Pet. 384–449, and *Joy* v. *Sears*, 9 Pick. 4, and *Buffinton* v. *Curtis*, 15 Mass. 528, and 1 Smith's L. C. 76. In this class of cases it may be said that the want of delivery at the time is explained within the principle of *Coburn* v. *Pickering*, 3 N. H. 415, upon the ground that such delivery was impossible, and therefore the presumption of fraud is repelled. See *Gardner* v. *Howland*, 2 Pick. 599, and *Peters* v. *Ballister*, 3 Pick. 495. On this ground a similar doctrine has been held in the case of the sale of a slave too sick to be removed at the moment.

But, in the case before us, this question does not arise, because the assignment was made on the 8th day of July, and nothing sent to the office until the 3d of August;

and this, we think, could not be regarded as using due diligence to perfect the assignment, if such entry and record were necessary. Nor do we think that books of the transfer agent in Boston can be regarded as the records or accounts of the shares or interests of the corporators, contemplated by the several statutes, in providing for the means of taxing the shareholders, enforcing their private liability, or for giving creditors the necessary information to enable them to attach or levy upon the stock. On the contrary, we think it quite clear that the law contemplates the keeping a record of the ownership of the stock in the state, and by an officer resident here, and competent to certify the same.

The law of 1850 (Laws of 1850, ch. 953, sec. 9 ; Comp. Stat., ch. 150, sec. 67) provides, that the treasurer and clerk of railroad corporations shall reside in this state, except where the railroad is part of one created by the acts of two or more states ; and this provision is not affected by the fact that the payment of dividends to stockholders is provided for at the place of business of the corporation in this state. The section provides " that the clerk and treasurer shall reside within this state, and all the books, papers and funds of said corporation, with the foregoing exception (that is, in case of a road in two states), shall be kept therein, or shall provide for the payment of all dividends to the stockholders in this state at the place of business of the corporation in this state."

This alternative provision, we think, is designed as a substitute for the keeping of funds for the payment of dividends, and the books and papers connected therewith in this state, and is not to be construed to dispense with the necessity of keeping a record or account of the stock in this state, or of the residence here of the clerk or treasurer.

By the Revised Statutes (ch. 146, sec. 13), prior to the act in question, no person could be eligible to the office of

clerk of any corporation, unless he was an inhabitant of
the state ; and it is quite clear, from the whole course of
the legislation prior to this law of 1850, that the keeping
of the records or accounts of the shares or interests of
the corporators, by the treasurer or other officer in this
state, has been steadily contemplated by the legislature.
This is manifest by the law requiring the clerk of the
corporation to return a list of the stockholders to the
town-clerk, under a penalty of fifty dollars ; Comp. Stat.,
ch. 147, secs. 8–12 ; the provisions for the attachment of
stock, by leaving a copy of the writ and return with the
clerk, treasurer or cashier ; the provision requiring the
officer having the care of the records of stock to exhibit,
on demand, to the officer making such attachment, a cer-
tificate of the number of shares owned by the debtor,
and to exhibit to him such records and documents as may
be useful to the officer in discharging his duty, and sub-
jecting him to a penalty and damages for neglect ; Comp.
Stat., ch. 207, secs. 16–21. So, in relation to manufactur-
ing corporations, it is provided that, if the treasurer does
not reside within this state, the stock record shall be kept
within this state by the clerk.

With these provisions and this policy in view, it will
hardly be contended that the alternative provision, in
regard to the payment of dividends in this state, is to be
regarded as a substitute for the residence of the clerk
and treasurer, and the keeping of the stock record in this
state ; for it is quite obvious that such provision for the
payment of dividends can, in no aspect of the case, be
regarded as a substitute for keeping the stock record here,
and in the hands of a certifying officer of the corporation.
To authorize a construction that would make this alterna-
tive provision a substitute for all the rest, would require
language much more explicit than we find there.   If,
then, an entry of the transfer in the books of the corpora-
tion be necessary to a valid transfer as against this plain-

tiff, we hold that it must be done in the books kept in this state.

The question, then, is whether such entry is necessary. In this case both the plaintiff and the Granite Bank were creditors of Holbrook, the former owner of the stock, and both claim under him; one by sale on execution, and the other by voluntary transfer from the debtor. By the law of New-Hampshire, as it has existed ever since 1812, stock in all corporations is subject to attachment and execution; and the question is, whether the transfer was so far perfected as to be valid against the plaintiff's attachment. In deciding this question it is not material to determine the precise character of this property, whether such stocks be regarded as choses in action or not; because we are satisfied that it comes within the provisions of the statute of 13 Eliz., ch. 5, even if regarded as choses in action. The terms used in that statute, in respect to personal property, are " goods and chattels," but they are construed to embrace things in action as well as in possession. 2 Bl. Com. 384, note 1; *Ford & Sheldon's Case,* 12 Co. 1, applying to an act of Parliament; *Ryal* v. *Rowles,* 1 Atk. 164, 182, and same case in 1 Ves. 348, 363, 366, 367, 369, 371. This case involved the construction of the terms " goods and chattels" in the statute of 21 James I., relating to conveyances by persons afterward becoming bankrupt; and it was held that they included a conveyance of a share in a trading concern by one of the partners; and it was expressly held that these terms in an act of Parliament would include choses in action. And such, we think, has been the doctrine of the courts in this state, as shown in cases of foreign attachment and otherwise. *Hutchins* v. *Sprague,* 4 N. H. 469; *Giddings* v. *Coleman,* 12 N. H. 153; *Langley* v. *Berry,* 14 N. H. 82; *Newman* v. *Bagley,* 16 Pick. 570; *Richmondville Company* v. *Pratt,* 9 Cow. 487.

The claim of the Granite Bank arises from what must

be regarded as a, pledge; and to be valid, a delivery is essential, at least as against creditors. To constitute such delivery, the assignee should be clothed with the usual marks and indications of ownership. In the case of things in possession, there should be a manual delivery and change of possession, or its equivalent. In the case of things in action, the usual muniments of title should be conferred upon the assignee. As to the former, it is held that if the articles are bulky, the delivery of the key of the warehouse in which they are deposited will suffice. *Ryal* v. *Rowles*, 1 Ves. 362. See *Patten* v. *Smith*, 5 Conn. 200. So in case of the sale of goods at sea, a transfer of the bill of lading, by indorsement, is, by the commercial law, valid as to creditors. *Caldwell* v. *Ball*, 1 T. R. 205–211; *Conrad* v. *Atlantic Ins. Co.*, 1 Peters 444, and cases cited. *Lanfear* v. *Sumner*, 17 Mass. 112. A bill of lading is an acknowledgment, under the hand of the captain, that he has received the goods, and will deliver them to the person named therein, and, by the well settled principles of the commercial law, is assignable by indorsement; and this is equivalent to the actual delivery of the goods. Such transfer is the ordinary and appropriate mode of selling goods at sea; and it was held in *Caldwell* v. *Ball*, 1 T. R. 205–215, that when two bills of lading were signed by the same captain, the person to whom one was first transferred would hold the goods. So where the goods sold are in the custody of another, and an order is given to the depositary to deliver them to the buyer, which is presented to him; there the sale is complete. *Plymouth Bank* v. *Bank of Norfolk*, 10 Pick. 459; *Tuxworth* v. *Moore*, 9 Pick. 348. In the case of real estate mortgaged, where the title deeds are left with the mortgagor, who makes a second mortgage and delivers the title deeds, the first will, in equity, be postponed to the second. *Ryal* v. *Rowles*, 1 Ves. 360.

In 'regard to the assignment of choses in action, as a

bond or promissory note, a delivery is essential as against a subsequent assignee, or, probably, a creditor. *Ryal* v. *Rowles*, 1 Ves. 348, 362, *Burnet*, J.; *Parker*, Baron, 366. As to goods and chattels in possession, a substantial change of possession is, by our law, essential, when it can be had. The want of it, unexplained, is conclusive evidence of a secret trust, and shows the sale to be fraudulent as to creditors. In the case of stocks, the natural and appropriate indication of ownership is the entry upon the stock record. This is indicated by the ordinary course of dealing in such property, and has been assumed in our legislation for many years; and it is manifested in the provisions in regard to returns of stock, by the clerks or treasurers, for the purposes of taxation, private liability and attachment; all of which assume that the records will show the ownership of the stock, and some of which continue the individual liability so long as the returns borne upon such record remain unchanged. In respect to manufacturing corporations, by express provisions a a transfer of stock avails nothing against an attachment until entered upon the corporation records. So, too, such record is expressly recognized as essential in the certificates and in the transfer of the stock in question.

Until, then, the transfer is recorded, or is entered for record, we think there has been no such change of possession as will prevail against an attaching creditor, unless in cases, as before suggested, where due diligence has been used to make such record, and the attachment has intervened. We are aware that choses in action may be transferred by a simple delivery of the evidence of indebtedness, with an indorsement thereon, in certain cases; but it will be observed that, in these cases, all such changes in the indications of ownership as the nature of the case will admit, are required. If, therefore, upon the transfer of a bond or bill of exchange, it be retained by the assignor, a subsequent purchaser, without notice,

---

---

would acquire a good title. Indeed, it may be laid down as a general principle governing the transfer of every species of personal property, that, to be good against innocent third persons, such transfer must be accompanied with such change of possession and indications of ownership as the nature of the thing is capable of; otherwise the seller is enabled, by means of an apparent ownership, to obtain a fictitious credit, and to deceive both creditors and purchasers. To avoid such consequences the law has always watched such conveyances with extreme solicitude. In this respect we see no distinction between things in action and things in possession; but, for aught that we can see, the same general rules must apply to both.

It is true that, at common law, choses in action were not the subject of attachment or execution, except by the custom of London, and there only when the garnishee lived in the city, and the debt arose there. Com. Dig., Attachment, A. D. Nor did it extend to stocks in the East India Company. But now, by the laws of New-Hampshire of no distant date, choses in action are made the subject of foreign attachment; and stock in corporations may now be attached specifically, like things in possession. Under these circumstances, and in view of the rapid increase and the vast amount of such property, it becomes extremely material to make a correct application, to this species of property, of the principles which regulate the transfer of other kinds of property.

In the case before us, the stock was pledged to the Granite Bank on the 8th day of July, 1854, as collateral security for the owner's indebtedness, by a delivery of the certificates, indorsed by him, to the bank of which he was then president; and nothing further was done toward taking possession of the stock until the third day of the following August, when the old certificates were surrendered to the transfer agent, and new ones received by the bank. The act of transfer by Holbrook must be regarded

as done on the 8th of July, and whatever was done afterward was the act of the bank; and the question is, whether due diligence was used by the bank in taking possession of the stock. It may be answered that, as the transfer was made at a distance from the place where the stock records were kept, a reasonable time should be allowed, to communicate with the officer; but the case finds nothing, and nothing is suggested, that could justify a jury in finding that the entry was made in a reasonable time after the act of transfer. There is no suggestion that the communication was made at the earliest convenient opportunity after the transfer on the 8th of July; and if there was a daily mail communication with Manchester, there could be no ground to claim that due diligence was used. Nor could the exchange of certificates, at the transfer agency, be regarded as equivalent to a record, or the entry for that purpose in the office at Manchester. If forwarded by the transfer agent and recorded, it then would be perfected; but we are unable to regard the act of the transfer agent, in respect to the record, as any thing more than the act of a mere agent of the bank. To give to the notice and entry at the transfer agency the effect of a record or entry upon the stock book of the corporation, would, as we think, be contrary to the policy of the law, which requires, as the chief evidence of ownership, the record or entry in the books of the corporation kept in this state. Such a rule is simple and easy of application, and is demanded for the convenience of the corporation, and the interests of the stockholders and their creditors. The transfer agent is in no sense the keeper of the stock record, and notice to him is not notice to the keeper of that record.

This case, then, is one where due diligence was not used to take possession of the stock; but, in respect to the creditors of Holbrook, it was, for nearly one month, left in his possession, he retaining, as before, the usual

indications of ownership, such as membership of the corporation, and a right to vote on the stock, his private liability for debts, and his liability to be taxed, and being, indeed, for all purposes, the ostensible owner of the stock. Indeed, the retaining these evidences of ownership, in the case of an absolute sale of the stock, or any transfer which implies a delivery, would be no less inconsistent and no less indicative of a trust than the retaining possession of goods, capable of manual delivery, upon an absolute sale.    If there be any substantial difference, the inconsistency would be more marked in the case of the stock, inasmuch as in the case of goods and chattels, which are tangible, it is often convenient to disconnect the use from the ownership for a time.    And we are inclined to think the retention of the possession of goods which are tangible would be less likely to mislead creditors and purchasers, than the omission to make the proper entry in the stock record, on the transfer of stocks.    Indeed, such a neglect to perfect the transfer of stock as this case discloses, could hardly fail to excite suspicions as to the existence of a fixed intention to perfect the transfer at all, at the time it was made.    Whatever the fact may be in this case, it is quite apparent that, if such transfers are held good as against creditors, it would open a wide door for the mischiefs which are denounced by the statute of 13 Eliz.; especially would it be so in these times, when so large a portion of all the property of the country is in corporation stocks.    It is to be observed, also, that this transfer affords no information as to the amount for which it is pledged, or for what; and it might deserve very grave consideration whether a transfer, valid as against creditors, of attachable property, can be so made.    But it is not necessary to consider this question now, nor do we inquire whether there existed an actual fraudulent intent or not.

We are brought to the conclusion that the possession

of the stock was not changed, and that no satisfactory explanation of it is given; and that, therefore, there is shown a secret trust, which avoids the transfer as to this plaintiff. The conclusion we have reached, on this point, renders it unnecessary to consider the other.

The only question·remaining is, as to the measure of damages. The general rule here and elsewhere is, that in an action on a contract to deliver goods, stocks, and other personal property, the measure of damages is the value of the property at the time and place of delivery. But a distinction has been made in some jurisdictions, by which, where the price has been paid in advance, the plaintiff has been allowed to elect the value at the time when the property ought to have been delivered, or at the time of trial, or, as some cases hold, the value at any intermediate period. Such a distinction has been recognized in England, in New-York, and in the courts of some other states in the union, upon the ground that the seller, having got the money of the plaintiff, the latter may be deprived of the means, by the seller's act, of going into the market and purchasing the same property at the then market prices. In *Shepard* v. *Johnson,* 2 East 210, it was held in an action for not replacing stock loaned, at the time appointed, it having afterward risen, that the measure of damages was the value at the time of trial. This doctrine, and the reason for it, was recognized in *Gunning* v. *Williamson,* 1 C. & P. 625, which was an action of trover for East India warrants, for cotton, which had risen after the conversion. So in *Gainsford* v. *Carroll,* 2 B. & C. 624; *McArthur* v. *Lord Seaforth,* 2 Taunt. 257; *Payne* v. *Breck,* 2 East 213, note to *Shepard* v. *Johnson.* In *Downs* v. *Back,* 1 Stark. 318, it was held that the plaintiff might estimate his damages at the value of the stock at the time of trial. In *Harrison* v. *Harrison,* 1 C. & P. 412, on a bond to replace stock, it was held that the value, at the time of trial, was the measure of damages. These cases

go upon the ground that a judgment for damages equal to the market value at the time of such judgment, would enable the plaintiff to purchase similar property, and thus operate like a decree for specific performance of the contract.

Mr. *Starkie*, in his work on evidence, 3 Stark. 1624, lays it down that the damages may be the value at the time of delivery, or the time of trial, " or, as it seems, on any intermediate day;" but he cites against the rule *McArthur* v. *Lord Seaforth*, 2 Taunt. 257. In 3 Phill. Ev. 103, it is said that the plaintiff may elect the value at the time of delivery, or the time of trial, but not, as it seems, upon any intermediate day; and see 1 Saund. Pl. & Ev. 377 and 677; Chitt. on Con. 393, note 2 by Perkins. In *Dutch* v. *Warren*, which is stated in *Moses* v. *Macferlan*, 2 Burr. 1010, where there was a contract to deliver stock, the price being paid in advance; held, that the value, at the time of the breach, was the measure of damages, though less than the sum paid. So, where on a loan of stock to be replaced at a certain day; held, that the measure of damages was the value on that day. *Sanders* v. *Kentish & Hawkesly*, 8 T. R. 162.

In *West* v. *Wentworth*, 3 Cow. 82, it was held that for the breach of a contract to deliver salt, the price having been paid in advance, the measure of damages was the highest market price between the time the salt was due and the time of trial; and the cases cited to sustain the decision are *Cortelyou* v. *Lansing*, 2 Caines' Cas. Err. 216, and *Shepard* v. *Johnson*, 2 East 211, neither of which goes to that extent. The case of *Clark* v. *Pinney*, 7 Cow. 681, decided by the same Judge *Sutherland*, takes the same ground, after a review of the English cases; and these decisions have been followed by the courts of some other states, as in *Bank of Montgomery* v. *Reese*, 26 Penn. 143; which was an action against the plaintiff in error, for wrongfully refusing to allow the defendant in error to

subscribe for and receive certain stock in the bank. The court fully recognizes the rule laid down in *West* v. *Wentworth* and *Clark* v. *Pinney*, as applicable to stocks; but suggests a different rule in respect to articles which are unlimited in production. The court hold, however, that it is immaterial whether the stock has been paid for or not, but that the rule is the same in either case; and the court cites *Cud* v. *Rutter*, 1 P. Wm. 570 and note, which holds the same doctrine, as it would seem, where the price was not paid in advance, and citing also *Vaughan* v. *Ward*, 1 Mylne & Keen 403. In *West* v. *Pritchard*, 19 Conn. 212, it was held that the plaintiff was entitled to the value at the time of trial, or at the time appointed for the delivery; and that this rule applies to other personal property as well as stocks; although in *Wells* v. *Abernethy*, 5 Conn. 227, *Hosmer*, C. J., had expressed a strong repugnance to the doctrine. *Brandon* v. *Barlow*, 4 Tex. 289, and *Calvit* v. *McFadden*, 13 Tex. 324, accord with *West* v. *Pritchard*, in giving the value at the time of trial. In *Shepard* v. *Hampton*, 3 Wheat. 200, is a dictum of *Marshall*, C. J., to the effect, simply, that he should think the value at the time of delivery would not be the rule where the price was paid in advance, but he does not state what it should be.

On the other hand, the case of *Startup* v. *Cortuzzee*, 2 Cr. M. & R. 165, is in opposition to the dicta in *Gainsford* v. *Carroll*, and to *Clark* v. *Pinney* and *West* v. *Wentworth*. In that case, which was an action for not delivering a cargo of linseed, according to a contract of sale, on which the plaintiff had advanced a moiety of the price, Lord *Abinger* charged the jury that the plaintiff was not entitled to damages according to the value at the time of trial, and that it was not like a suit for not replacing stock; and this was sustained, on motion for a new trial, by the whole court, there being no evidence that the plaintiff had in fact sustained any special damage. See a statement of

this case in *Suydam* v. *Jenkins*, 3 Sandf. 641, where *Duer*, J., reviews the cases, and holds, in opposition to *West* v. *Wentworth* and *Clark* v. *Pinney*, that the highest intermediate price ought never to be taken as the rule of damages, either in trover or assumpsit, unless it be shown that the plaintiff would have realized that price had the contract been performed. This case (commencing on page 614) is an elaborate review of the cases, and the court hold that the rule of damages must be the same in trespass, trover, replevin or assumpsit. Chancellor *Kent* (2 Cow. 648, note) says he does not regard the distinction, as to the rule of damages arising from the payment of the price in advance or not, as well founded or supported; and he says that the value at the time of the breach is a plain, stable and just rule; and so it seems is the conclusion in Sedgwick on Damages, 260, 280, 277, after a review of the cases, and see the cases in 2 Kent's Com. 648, note. In *Gray* v. *Portland Bank*, 3 Mass. 364, 390, it was held that the value of the stock, at the time of delivery, and not on the day of trial, was the true measure of damages; and the case of *Shepard* v. *Johnson*, 2 East 211, is expressly overruled. *Sedgwick*, J., says this rule has been long established and invariably adhered to in Massachusetts. The same rule was applied in *Kennedy* v. *Whitwell*, 4 Pick. 466, which was trover, and, after the conversion, the defendant sold the goods for a greater price; but it was held that the value at the time of the conversion was the measure of damages; and so in *Sergeant* v. *Franklin Ins. Co.*, 8 Pick. 90, it was held that the value of the stock, at the time it should have been transferred, was the rule, and the court adopt the doctrine of *Gray* v. *Portland Bank* and *Kennedy* v. *Whitwell*, and consider this case as standing on the same ground as the conversion of goods; and so is *Henry* v. *Manufacturers and Mechanics' Bank*, 10 Pick. 415; where certificates of stock were withheld.

In replevin, the value of the property when it ought to

Pinkerton *v.* Railroad.

have been restored, is the true measure of damages. *Swift*
v. *Barnes*, 16 Pick. 194, 196. In *Smith* v. *Dunlop*, 12 Ill.
184, which was much considered, and the English and
New-York cases examined, the rule in Massachusetts is
sustained. In *Hopkins* v. *Lee*, 6 Wheat. 106, it was held
that the value of the land when it ought to have been con-
veyed, which was when it was paid for, was the measure
of damages. So in *Cox* v. *Henry*, 32 Penn. 18, which was
a contract to convey real estate, the price having been
paid in advance, it was held that the value at the time it
should have been conveyed is the measure of damages.

In *Mitchell* v. *Gile*, 12 N. H. 390, it was said that the
value at the time of the breach is the measure of dam-
ages. But this is laid down as a general proposition, and
the distinction arising from previous payment is not ad-
verted to. Nor do we find such a distinction recognized
in any New-Hampshire case. See, also, *Stevens* v. *Lyford*,
7 N. H. 360.

There being, then, much conflict in the authorities, the
question is to be settled upon principle; and it may be
assumed that the plaintiff is entitled to such damages as
will be a full indemnity for withholding the stock. The
general rule is, undoubtedly, that he shall have the value
of the property at the time of the breach; and this is a
plain and just rule and easy of application, and we are
unable to yield to the reasons assigned for the exception
which has been sanctioned in New-York and elsewhere.
It is true that, in some cases, the plaintiff may have been
injured to the extent of the value of the property at the
highest market price between the breach and the time of
trial. But it is equally true that, in a large number of
cases, and, perhaps, generally, it would not be so. In
that large class of cases where the articles to be delivered
entered into the common consumption of the country, in
the shape of provisions, perishable or otherwise, horses,
cattle, raw material, such as wool, cotton, hides, leather,

dye stuffs, &c., to hold that the plaintiff might elect, as the rule of damages in all cases, the highest market price between the time fixed for the delivery and the day of trial, which is often many years after the breach, would, in many cases, be grossly unjust, and give to the plaintiff an amount of damages disproportioned to the injury. For, in most of these cases, had the articles been delivered according to the contract, they would have been sold or consumed within the year, and no probability of reaping any benefit from the future increase of prices. So there may be repeated trials of the same cause, by review, new trial, or otherwise. Shall there be a different measure of value at each trial? In the case of stocks, in regard to which the rule in England originated, there are, doubtless, cases, and a great many, where they are purchased as a permanent investment, and to be held without regard to fluctuations; and to hold that the damages should be the highest price between the breach and trial, when there is no reason to suppose that a sale would have been made at that precise time, would also be unjust. But it may be fairly assumed that a very large portion of the stocks purchased are purchased to be sold soon; and to give the purchaser, in case of a failure to deliver such stock, the right to elect their value at any time before the trial, which might often be several years, would be giving him not indemnity merely, but a power, in many instances, of unjust extortion, which no court could contemplate without pain.

In view of such results, the courts in England and New-York have been inclined to shrink from the application of that rule, in many cases; and it has been held that it would not be applied where the action was not brought in a reasonable time; and this, undoubtedly, because of the injustice of allowing the plaintiff to take advantage of the fluctuations of many years. But even if brought in a reasonable time, and what is a reasonable time is not

---

Pinkerton *v.* Railroad.

---

easy to say, there might be often a lapse of many years before a final trial. In actions of trover, trespass and replevin, there would be stronger reasons for the application of such a distinction than in cases of contract; inasmuch as the plaintiff is not only deprived of the use of his property, and the means to replace it from the avails, but is so deprived by the tort of the defendant. If, then, the rule is just, it should be applied in these actions, the form of the action not being material in this respect; and in jurisdictions where this doctrine is recognized it has been so applied; as in *Wilson* v. *Matthews*, 24 Barb. 295, and *Gunning* v. *Wilkinson*, 1 C. & P. 625, which was trover for East Indian warrants for cotton. In *Wilson* v. *Matthews*, the highest market price between the breach and the day of trial was held to be the rule.

In this state no such rule has been adopted, and it requires no citation of authorities to show that, as applied to actions of trespass, trover or replevin, it would find no countenance here.

The same reasons which oppose the right of electing the value at any intermediate day, as the rule of damages, apply also to an election between the time of the breach and the time of the trial; and we are disposed to hold the value at the time of the breach, or when the articles ought to have been delivered, as the just and convenient rule.

In accordance with our views is the case of *Wyman* v. *American Powder Works*, 8 Cush. 164. In that case, the corporation refused to give the plaintiff a certificate of shares to which he was entitled, or to recognize him as owner, but sold them to another; and it was decided that the defendant was liable for the value of the shares at the time of the demand, and interest from that time; and with this decision we are satisfied.

In this case, therefore, after reducing the amount to accord with these views, there should be

*Judgment on the verdict.*